UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**MONICA S. PIPPIN,**

        Plaintiff,

vs.                     **Case No.: 8:02-CV-2329-T-17EAJ**

**PLAYBOY ENTERTAINMENT GROUP,
INC.,** a Delaware corporation,
et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

The issue of the value of Mr. Richard Shankman, Esq.'s attorney's fees is before the court.[1]  On May 25, 2005, May 31, 2005, and June 16, 2005, the court held evidentiary hearings on the preliminary issue of complete forfeiture of Mr. Shankman's attorney's fees.  On August 9, 2005, the court ruled that Plaintiff discharged Mr. Shankman with cause. (Dkt. 374)  The court then held an evidentiary hearing regarding the <u>quantum</u> <u>meruit</u> value of Mr. Shankman's fees on October 20, 2005.

Based on the written submissions of the parties and the evidence of record, including deposition transcripts the parties

---

[1]  On March 31, 2005, Plaintiff filed **Monica S. Pippin's Renewed and Supplemental Motion for Disbursement of Funds.** (Dkt. 300)  On April 1, 2005, the district judge denied Plaintiff's motion without prejudice and referred the issue of Mr. Richard Shankman, Esq.'s attorney's fees to the undersigned for a report and recommendation. (Dkt. 304)  Plaintiff subsequently filed an **Amended Renewed and Supplemental Motion for Partial Disbursement of Settlement Funds.** (Dkt. 350)

filed regarding complete fee forfeiture and the <u>quantum</u> <u>meruit</u> value of Mr. Shankman's attorney's fees, and having fully considered the issues presented, the court recommends that Mr. Shankman's attorney's fees be valued at $29,560 and that the balance of Plaintiff's settlement proceeds be disbursed to reflect this determination.

At the outset, it must be noted that due to Mr. Shankman's inability to resolve the fees dispute with his former client (unlike the Plaintiff's other former attorneys), this issue has consumed a substantial amount of time on the part of the court, the parties, and counsel including two evidentiary hearings lasting a total of four days, five status conferences, one show cause hearing regarding a witness's violation of the rule of sequestration, and numerous depositions and written submissions comprising a total of approximately 130 docket entries.

I.   <u>Findings of Fact</u>

    **A.   Background**

1.   In March of 2001, a spring break wet t-shirt contest took place at Deslin Hotels, Inc., d/b/a Desert Inn Resort Motel in Daytona Beach, Florida. (Dkt. 339 at 12)  Plaintiff, a resident of Plant City, Florida, participated in the contest. (Dkt. 38 at 8) She was 16 years old at the time. (<u>Id.</u>)

2.   The contest, including Plaintiff's participation, was videotaped. (<u>Id.</u> at 11)  Without Plaintiff's knowledge, the tapes

2

were sold and broadcast. Plaintiff learned of the existence of the tapes through a neighbor. (See Dkt. 417, September 14, 2005 Deposition of Richard Shankman ("Shankman Depo. I") at 35-36)[2] Plaintiff alleged in the pleadings filed in this case that the video was marketed and distributed in various formats. (Dkt. 1)

3. Sometime in mid-July of 2002, when she was still a minor, Plaintiff approached Plant City attorney Christopher Tancredo, Esq. ("Mr. Tancredo") of the law firm Shankman, Tancredo & Co., L.C. ("STC") to originate a lawsuit arising out of the videotaping of this event. (T2 190)[3] Plaintiff's primary goal in retaining counsel and initiating litigation was to stop the sale and distribution of the videotapes (T2 193-94): "I didn't want my tape to be out there. I wanted the – to stop the production of the tape and the selling." (T1 180)

4. Mr. Tancredo introduced Plaintiff to his partner, Mr. Richard Shankman, Esq. ("Mr. Shankman"), who began the initial investigation into Plaintiff's potential causes of action.

5. Mr. Shankman had no prior experience litigating cases in federal court; he had practiced law for only three years when Plaintiff engaged STC to represent her. (Dkt. 339 at 12; T2 63)

---

[2] "Shankman Depo. II" refers to the September 21, 2005 continuation of Mr. Shankman's deposition. "Shankman Depo. III" refers to the September 24, 2005 continuation of his deposition.

[3] "T1" through "T4" refer to the evidentiary hearings that took place before the undersigned on May 25, 2005, May 31, 2005, June 16, 2005, and October 20, 2005, respectively.

STC did not have the financial resources to advance the costs of Plaintiff's litigation on its own. (Dkt. 339 at 12)

6.  For these reasons, Mr. Shankman decided that trial counsel experienced in federal litigation should be brought into the case as co-counsel, and Plaintiff agreed.

**B.   Mr. Shankman's Association with Trenam Kemker**

7.  Shortly after Plaintiff retained STC, Mr. Shankman approached the law firm of Trenam Kemker, P.A. ("Trenam Kemker") in Tampa, Florida regarding possible representation of Plaintiff and advancing all costs in the litigation. (Id.; T2 192)

8.  On July 16, 2002, Trenam Kemker and STC entered into a contingency fee agreement (the "Trenam Agreement") with Plaintiff. (Plf. Ex. 1; T1 33)[4]  The Trenam Agreement provided that the attorneys would receive 40% of Plaintiff's gross recovery. (Id.) Mr. John Vento, Esq. ("Mr. Vento") and Mr. Bernard Silver, Esq. ("Mr. Silver") were the attorneys at Trenam Kemker handling Plaintiff's case.

9.  Under the Trenam Agreement, STC was to receive 32% of the

---

[4]  "Plf. Ex." and "Shankman Ex." refer to exhibits offered by Plaintiff and Mr. Shankman, respectively, over the course of the evidentiary hearings leading up to this Report and Recommendation. The court has reviewed Plaintiff's objections to Mr. Shankman's exhibits included in her supplemental brief and holds that the objections are overruled as to Shankman Ex. 40, 41, 43, and 45. (See Dkt. 429 at 19-20)  The court sustains Plaintiff's objections as to Shankman Ex. 42, 44, and 46-49 on the grounds of relevance. Further, unless otherwise stated, any other evidentiary objections to matters discussed herein are overruled.

total contingency fee, or 12.8% of Plaintiff's gross recovery, and Trenam Kemker would receive 68% of the fee. (Id.) Mr. Shankman's agreement with his partner, Mr. Tancredo, was that Mr. Shankman would receive 75% of STC's share (9.6% of Plaintiff's gross recovery) and Mr. Tancredo would receive 25%. (Dkt. 339 at 13)

10.   On December 20, 2002, approximately five months after Plaintiff first approached STC and after Mr. Shankman investigated Plaintiff's potential claims and potential defendants and witnesses, Plaintiff filed the instant action naming six defendants in eight counts and alleging violations of the Act Protecting Children Against Sexual Exploitation, 18 U.S.C. 2251, et. seq., violations of Fla. Stat. Ann. § 540.08, regarding the unauthorized publication of a name or likeness, and tort causes of action. Plaintiff's complaint also sought injunctive relief.[5] (Dkt. 1; Dkt. 339 at 9)

11.   Mr. Shankman and the Trenam Kemker attorneys had disagreements over whether to serve interrogatories with the complaint or wait until after receiving Rule 26 disclosures from defendants.[6] (T1 44-45) Mr. Shankman also believed Trenam Kemker's

---

[5]   The original defendants were Playboy Entertainment Group, Inc., Lincolnwood Motion Pictures, L.L.C., Image Entertainment, Inc., New City Releasing, Inc., Trans World Entertainment Corp., and Best Buy Company, Inc. (Dkt. 1)

[6]   This disagreement underscores Mr. Shankman's ignorance of federal practice; federal discovery rules prohibit formal discovery requests until the parties have attended a Rule 26(f) scheduling conference.   Rule 26(d), Fed.R.Civ.P.   However, it is also true

proposal to use a jury consultant who was to receive a "substantial results bonus" on a contingency fee basis with Plaintiff was an unethical conflict of interest. (T1 40; T2 196) Mr. Shankman voiced a concern about the jury consultant's fees at a January 7, 2003 meeting between Plaintiff, Mr. Shankman, Mr. Vento, and Mr. Silver. (T1 40)

12.  According to Mr. Silver, he or another attorney with Trenam Kemker contacted the Florida Bar Ethics Hotline and the firm's malpractice insurance carrier who had no concerns about the arrangement with the jury consultant.[7] (T1 41)

13.  Mr. Shankman and the Trenam Kemker attorneys had a difference of opinion about whether to seek preliminary injunctive relief to stop the sale and broadcasting of the video.  At some point during Plaintiff's representation by Trenam Kemker, a number of defendants sent Plaintiff letters stating that distribution of the video had ceased.  (Shankman Depo. III at 243-44)  Mr. Shankman, however, was able to purchase copies of videos and believed that defendants' assurances were incorrect.  (Id. at 244)

---

that Mr. Shankman never pretended to be anything other than a novice attorney in federal court which is why he retained experienced federal litigators as co-counsel.

[7] Mr. Shankman contacted the Florida Bar and was told that the fee arrangement with the jury consultant was improper. (Shankman Ex. 40, 41) However, Mr. Shankman did not provide the ethics counsel with the information that the client was paying the jury consultant fee out of her portion of the recovery, not the attorneys', which Mr. Shankman admitted was a critical distinction. (See T1 40-41; T3 63)

14.   On January 14, 2003, through a telephone message left with Mr. Vento's secretary, Mr. Shankman told Mr. Silver and Mr. Vento that Trenam Kemker was fired from the case. (Dkt. 339 at 14; T1 36)

15.   On January 15 or 16, 2003, Mr. Silver spoke with Mr. Shankman by telephone. (T1 36) Mr. Shankman stated that he would deliver a confirming termination letter advising of Plaintiff's new lead counsel by January 16, 2003. (Dkt. 339 at 14; T1 38-39)

16.   On January 24, 2003, Mr. Shankman responded by letter that he and Plaintiff were terminating the relationship with Trenam Kemker, but the letter did not include Plaintiff's written confirmation. (Plf. Ex. 4; T1 45-46)

17.   On January 29, 2003, Plaintiff executed a discharge letter to Trenam Kemker.[8] (Plf. Ex. 6; T1 47-48, 108)

18.   Mr. Shankman told Plaintiff that the Trenam Kemker lawyers were fired for cause, and that this meant she did not have to pay them. (T1 109) Mr. Shankman also told Plaintiff and her mother and stepfather, Mrs. Selina and Mr. Fred Shelton Keely, Jr. ("Mrs. and Mr. Keely"), that if they had to pay any costs Trenam

---

[8] Although Plaintiff testified that Mr. Shankman advised her to discharge Trenam Kemker, "[i]t was up to [Plaintiff] who would be fired." (T1 165) She "signed what Rick [Shankman] told her to sign." (T1 192) "Basically Rick came in and said, 'Oh, they're fired.  Sign this'. . . . [o]bviously they can't be fired unless I sign a paper, because I am the only one who could legitimately fire them." (T1 194-95) Plaintiff signed the documents intending to fire Trenam Kemker. (T1 193)

Kemker had incurred, the amount would be very small. (T1 111)  Mr. Shankman told Plaintiff and her parents not to communicate with Trenam Kemker at all. (T1 112-13)

### C.   Mr. Shankman's Association with the Gary Firm

19.   On January 23, 2003, before she signed the papers terminating her relationship with Trenam Kemker, Plaintiff and her mother entered into a contingency fee agreement (the "Gary Agreement") with Mr. Shankman and the law firm of Gary, Williams, Parenti, Finney, Lewis, Watson & Sperando, P.L. (the "Gary firm"). (Plf. Ex. 3)  Mr. Shields McManus, Esq. ("Mr. McManus") of the Gary firm first met Mr. Shankman and learned about Plaintiff's case sometime prior to January 23, 2003. (Dkt. 413, Deposition of Shields McManus ("McManus Depo.") at 7)

20.   Mr. Shankman recommended to Plaintiff and her parents that Plaintiff retain the Gary firm and sign the Gary Agreement. (T2 25)

21.   The total contingency fee under the Gary Agreement was 45%, a 5% increase over the contingency fee included in the Trenam Agreement. (Dkt. 339 at 14; Plf. Ex. 3; T1 127)  The Gary firm requested the 45% contingency fee.  (McManus Depo. at 10; T2 30; T3 31)  Mr. Shankman's agreement with Mr. McManus for the division of the 45% fee was one-third to Mr. Shankman and two-thirds to Mr. McManus. (Id.)  Mr. Shankman remained obligated to pay Mr. Tancredo 25% of the fees he received. (Plf. Ex. 3; T2 75-76) This increased

Mr. Shankman's potential recovery to 15% of Plaintiff's gross recovery.

22.   Under the Gary Agreement, Trenam Kemker's lien would be paid out of the contingency fee on a first-out basis, and Plaintiff was obligated to pay all costs expended on her behalf. (Dkt. 339 at 15; Plf. Ex. 3)

23.   Plaintiff does not know why she agreed to the 5% increase in the amount of the contingency fee in the agreement with the Gary firm. (T1 175) Before Plaintiff signed the Gary Agreement, Plaintiff's stepfather argued with Mr. Shankman over whether the Gary Agreement contained a fee increase. But after a while, Plaintiff "just kind of got frustrated and said 'whatever' and signed the paper. I was confused and stressed out and didn't know."[9] (T1 127, 175)

24.   Plaintiff did not remember at the time she signed the Gary Agreement whether the Trenam Agreement called for a 40% or a 45% contingency fee: "I didn't remember. I didn't know what it was. I didn't know if the other one was 40 or 45 percent." (T1

---

[9] There were times during the litigation when Plaintiff was confused about the best course of action, and she left certain decisions up to her stepfather after discussing them with him. (T1 167-68; T2 23)   "[T]here's some legal terminology that I am not familiar with, and I – [my parents] would try to explain it to me, and I – it's not that I was oblivious to the concept; it's just that I really couldn't comprehend because I had never been involved in any kind of legal anything." (T1 169) In fact, Plaintiff testified that she sometimes did not read or understand every document she was asked to sign. (T1 169-70)

175)

25.  Mr. Shankman told Mr. Keely that he was "pretty sure" the Trenam Agreement called for a 45% fee.[10] (T2 48)

26.  After Plaintiff signed the Gary Agreement, Mr. Keely consulted the Trenam Agreement and noticed that it contained a 40% contingency fee arrangement. (Id.)  Mr. Keely mentioned this to Mr. Shankman. (Id.)  However, the Gary Agreement was not amended or changed.

27.  The court approved the substitution of the Gary firm for Trenam Kemker by order dated February 5, 2003. (See Dkt. 18)

28.  On May 8, 2003, Plaintiff filed her First Amended Complaint. (Dkt. 38)  The amended complaint named eight new defendants and asserted five additional causes of action.

29.  On June 20, 2003, approximately five months after retaining the Gary firm, Plaintiff filed her Motion for Preliminary Injunction (Dkt. 87).  As with the Trenam attorneys, Mr. Shankman and Mr. McManus did not have the same views concerning the wisdom of seeking preliminary injunctive relief.  The court denied the motion on July 1, 2003. (Dkt. 106; Dkt. 339 at 15)

30.  Mr. Shankman was irritated with the Gary firm's handling of the motion for preliminary injunction.  Mr. Shankman wrote to

---

[10]  Mr. Shankman's testimony that he discussed with Mr. Keely the fact that the Gary Agreement contained a 5% increase at the time he presented the agreement to Plaintiff and the Keelys (T3 31) is not credible and is rejected.

Mr. McManus on July 17, 2003, and attempted to renegotiate the fee division between the firms.[11] (Plf. Ex. 11; T2 92)

31.     Before receiving this letter, the Gary firm, on Plaintiff's behalf, was actively engaged in setting up a settlement conference with the attorney for the Playboy Defendants.[12] (McManus Depo. at 32)   The parties had agreed to meet in Palm Beach, Florida, during Labor Day weekend for a settlement conference; the Gary firm was awaiting written confirmation that individuals with proper settlement authority (up to the insurance policy limits) would attend. (Id.)   The Gary firm also was working with Mr. Shankman in preparing a settlement video. (Id.)

32.     On July 22, 2003, Mr. Shankman formed the law firm of Litigation Concepts, L.C. ("Litigation Concepts").   (Dkt. 339 at 15; T2 90)

33.     On July 24, 2003, Mr. Shankman sent Mr. McManus an e-mail in which he purported to terminate the Gary firm's relationship with Plaintiff. (See Plf. Ex. 17; T2 114-15)   Also, some time in late July of 2003, Mr. Shankman prepared a letter for Plaintiff's

---

[11] Mr. Shankman waited at least 20 days to inform Plaintiff and her parents of his "'misgivings' with the Gary firm." (Plf. Ex. 14; T2 110-11)

[12] Playboy Entertainment Group, Inc., Playboy Enterprises International, Inc., Playboy Enterprises, Inc., Playboy.com, Inc., Lincolnwood Motion Pictures, L.L.C., New City Releasing, Inc., Image Entertainment, Inc., Trans World Entertainment Corp., and Best Buy Company, Inc. are referred to in these proceedings as the "Playboy Defendants".

signature that discharged Mr. McManus and the Gary firm as her lead counsel. (Plf. Ex. 26; Dkt. 339 at 15)  The letter instructed the Gary firm not to contact Plaintiff. (Plf. Ex. 26)

34.  Plaintiff did not sign the discharge letter terminating the Gary firm until August 6, 2003. (Id.)  Mr. Shankman told Plaintiff and her parents that the Gary firm's goal was to settle her case and that a partner in the Gary firm had an interest in a media corporation that Mr. Shankman wanted to add as a defendant to the case.[13]  (T2 26)  Plaintiff relied on Mr. Shankman's opinion that she should fire the Gary firm. (T1 132)

35.  Mr. Shankman told Plaintiff that she was firing the Gary firm for cause and instructed her not to contact the firm or else they might have to pay them money.  (T2 33)

36.  Also on August 6, 2003, Plaintiff signed an agreement with Litigation Concepts (the "Litigation Concepts Agreement") to represent her in the litigation with the authority to hire other

---

[13]  Mr. McManus testified that he told Mr. Shankman of the possible conflict in February of 2003, approximately six months before Plaintiff terminated the Gary firm, and assumed Mr. Shankman had informed Plaintiff of the issue at that time as he said he would. (McManus Depo. at 45) The court credits Mr. McManus's testimony on this point rather than any assertion by Mr. Shankman that he did not learn of this issue until later. Further, it appears that the potential conflict concerned a cable company that one of the Gary partners had an interest in, not one of the potential defendants ("IN-DEMAND") which Mr. Shankman wanted to add to the case. (Id. at 44) Because IN-DEMAND carried programs from the cable company on its channel, Mr. McManus raised the issue with Mr. Shankman at the beginning of the representation. (Id. at 44-45)

lawyers as lead trial counsel. (Plf. Ex. 19; Dkt. 339 at 16; T2 124)  The Litigation Concepts Agreement, like the Gary Agreement before it, contained a 45% contingency fee clause. (Plf. Ex. 19)

37.   Unlike the Gary Agreement, however, the Litigation Concepts Agreement did not contain language stating that Mr. Shankman agreed to share his fees with Plaintiff's prior counsel. (Id.; T2 127-29)

38.   Tellingly, Mr. Shankman did not advise Plaintiff or her parents that subsequent attorneys in a contingency fee case who do not commit to sharing their fees with the client's prior counsel obligate the client, and not the attorney, to pay any fee award determined by the court. (T2 131)  At some point during his representation of Plaintiff, Mr. Shankman learned that under Florida law a contingency fee agreement must specifically obligate a subsequent attorney to pay the fees of prior attorneys, otherwise the client pays them. (T2 128)

39.   Nevertheless, Mr. Shankman told Plaintiff that neither Trenam Kemker nor the Gary firm would be paid anything because Plaintiff fired them for cause.  (T1 138-39)  Plaintiff relied on Mr. Shankman's statement regarding payment of terminated attorneys because, "I trusted Rick [Shankman]. . . he was my lawyer.  So what was I supposed to think?" (T1 139)  Plaintiff understood that she

13

would be responsible for costs expended in the litigation.[14] (T1 178)

40.   Mr. Keely asked Mr. Shankman at least three times how firing the attorneys would alter the case, and Mr. Shankman explained that attorneys fired for cause "would not affect the case at all." (T2 34-35)  However, Mr. Shankman also stated that "[i]f anything would happen, it would be at the end of the case.  There would be a hearing called a quantum meruit where the attorneys would go in front of a judge to see, what, if any, fees they were involved – or could get, and which it would always come from the attorneys' fees of the case." (T2 34)

**D.   Mr. Shankman's Association with Arthur Tifford, P.A.**

41.   On August 8, 2003, Mr. Shankman met with Arthur W. Tifford, Esq. ("Mr. Tifford") of Arthur W. Tifford, P.A., regarding Plaintiff's case.[15] (Dkt. 339 at 16)

42.   On August 21, 2003, Plaintiff signed an addendum to the Litigation Concepts Agreement (the "Tifford Addendum") and hired Mr. Tifford and his firm as her counsel, along with Mr. Shankman and Litigation Concepts . (Dkt. 339 at 16; Plf. Ex. 19)

---

[14]   However, Mr. Shankman never billed Plaintiff for any costs he incurred in representing her.  (T3 23)  In fact, he never totaled his costs in the litigation. (T3 26, 29)

[15]   Arthur W. Tifford, P.A. changed its name to Tifford & Tifford, P.A. and continues to represent Plaintiff in this action. Mr. Tifford now represents Plaintiff with his law partner, Alexandra L. Tifford, Esq. ("Ms. Tifford").

43. In this agreement, Mr. Tifford and Litigation Concepts would receive a 45% contingency fee, which they agreed to split equally. (Plf. Ex. 19; T2 147, 214-15)   Mr. Shankman's fees increased, therefore, from one-third of 45% under the Gary Agreement to one-half of 45%, less the 25% he owed to Mr. Tancredo. (Dkt. 339 at 16)

44. Mr. Tifford and Mr. Shankman met on August 23, 2003, and Mr. Shankman presented Mr. Tifford with the Litigation Concepts Agreement and the Tifford Addendum. (Dkt. 339 at 16)

45. Mr. Tifford knew that two prior law firms had been involved with the case. (T2 144)   Mr. Shankman told Mr. Tifford that he told Plaintiff and her parents he would pay Trenam Kemker's and the Gary firm's <u>quantum meruit</u> recovery from his portion of attorneys' fees. (T2 144-45, 152, 154)

46. Each time Mr. Shankman presented Plaintiff and the Keelys with a new contingency fee agreement to retain new co-counsel, they asked him how hiring and firing counsel would impact Plaintiff's potential recovery. (T3 70-71)   Mr. Shankman orally assured them on a number of occasions that he would pay any attorneys' fees out of his fee allocation.[16] (T3 47-48, 69-71)

47. Mr. Shankman and Mr. Tifford had a dispute over the meaning and tenor of an email Mr. Tifford sent to Mr. Shankman on

---

[16] During the May 31, 2005 hearing, Mr. Shankman admitted that he made this assurance to Plaintiff but was no longer willing to pay their fees out of his portion. (T2 152-54)

April 9, 2004, in which he threatened to resign as co-counsel in another, related case if Mr. Shankman did not apologize to him for accusing him of purposely omitting a defendant in that case.[17] (Plf. Ex. 29-30; T2 39, 136; T3 79)

48.  Mr. Shankman responded to Mr. Tifford's April 9, 2004 e-mail within hours, accepting Mr. Tifford's "resignation" from Plaintiff's case.  (Plf. Ex. 31; T2 138-39; T3 10)  Mr. Shankman does not recall whether he consulted Plaintiff and her parents before sending this e-mail. (T2 139; T3 10)

49.  Mr. Shankman forwarded Mr. Tifford's e-mail regarding resignation to Mr. Keely on the same day, and Mr. Keely had the opportunity to review it.  (Shankman Ex. 33; T2 53, 176; T3 10) The Keelys discussed the e-mail with Plaintiff and advised her that, according to the e-mail, Mr. Tifford had resigned. (T2 54)

50.  In mid-April of 2004, Mr. Shankman met with Plaintiff and her parents.  He showed them the portion of the e-mail where Mr. Tifford demanded an apology from Mr. Shankman under the threat of resignation.   (T1 145; T2 36; T3 13-14)   Mr. Shankman told Plaintiff that Mr. Tifford had, in fact, resigned from her case, that Mr. Tifford would receive no money, and that he would "eat" the $60,000 in fees he had incurred. (T1 142; T2 160; T3 19)  Mr.

---

[17]    By that time. Mr. Shankman and Mr. Tifford were representing four other plaintiffs in cases arising out of the same wet t-shirt contest. (Dkt. 339 at 16 fn. 2; Plf. Ex. 20-22) These actions have not settled and are awaiting trial.

Shankman advised Plaintiff not to contact Mr. Tifford because, if she did, she might have to pay him. (T1 143; T2 188)[18]

51.  At Mr. Shankman's insistence, Plaintiff signed a document accepting Mr. Tifford's resignation.  (Plf. Ex. 33; T1 147)  At this point, Plaintiff and her parents did not want to hire or fire any more attorneys.  They were confused, however, and ended up signing the document.  They then told Mr. Shankman that "... you've got about 30 days to make something happen." (T2 40)

52.  Mr. Shankman did not contact Plaintiff or the Keelys regarding settlement of the case within 30 days. (T2 5, 46)

53.  Plaintiff signed another addendum to the Litigation Concepts Agreement on May 24, 2004 ("the May 24 Addendum").  In the May 24 Addendum, Plaintiff authorized Litigation Concepts to associate with the law firms of Restani, McAllister & Cassetty, P.A. ("Restani") and the Law Office of Kevin O'Connor, Esq. ("Mr. O'Connor") to represent Plaintiff as lead trial counsel. (Plf. Ex. 36)  The May 24 Addendum provided that Litigation Concepts would receive 50% of the contingency fee. (Id.)  Mr. Shankman remained

---

[18]  Mr. Shankman informed Plaintiff and the Keelys that Mr. Tifford was giving them a "'$60,000 gift, because he is resigned from the case'. . . . It's like the case was starting all over again with costs." (T2 42)  Also, "that this was a great thing that [Mr. Tifford] had done, and it was – the 60,000 that was owed to [Mr. Tifford] – I'm not sure if it was fees or costs, but it was a gift to us." (T2 160) Mr. Keely relied on this statement in advising Plaintiff to accept Mr. Tifford's resignation. (T2 45)

obligated to pay Mr. Tancredo 25% of his fee. (<u>Id.</u>)

54.  After Plaintiff signed the May 24 Addendum, Plaintiff and her parents had only one conversation with Kevin O'Connor and they never met David Cassetty. (May 11, 2005 Deposition of Fred Keely ("Keely Depo.") at 28-29).

55.  Plaintiff fired Mr. Shankman as her counsel on or around August 30, 2004, and re-hired Mr. Tifford to represent her. (<u>See</u> Plf. Ex. 34; Dkts. 257, 258)  Tifford & Tifford, P.A. remains counsel of record at this time.

56.  On August 27, 2004, Mr. Shankman filed a Notice of Charging Lien, referencing a "Contingency Fee Representation Agreement dated May 24, 2004."[19] (Dkt. 258)

**E.  Plaintiff's Reasons for Firing Mr. Shankman**

57.  Plaintiff fired Mr. Shankman for the following reasons, among others:  (1) his failure to initiate settlement talks once Plaintiff directed him to do so (T2 5); (2) Mr. Shankman induced her to accept Mr. Tifford's "resignation" without showing her the entire text of the e-mail from Mr. Tifford to Mr. Shankman (T2 7); (3) Plaintiff had hired and fired so many law firms that she was tired of Mr. Shankman's handling of the case (T1 200); and (4) Plaintiff asked Mr. Shankman to call her once a week to update her

---

[19]  The controversy surrounding which fee agreement controls is discussed <u>infra</u>.

on the status of the case, and he never did this.[20] (T1 200-01)

58.   The reasons Plaintiff stated for Mr. Shankman's discharge are based on information Plaintiff had at the time.   Later, she discovered that, among other things, Mr. Shankman had made misrepresentations regarding her liability for the fees of attorneys she had discharged. (T2 7-9)

59.   Plaintiff does not know the amount of her damages flowing from the decision to terminate Mr. Shankman; but she asserts that her damages include the fees and costs paid to prior counsel, the costs and expenses associated with these proceedings[21], and the loss of use of her settlement proceeds due to the delay in disbursement. (Dkt. 414, September 22, 2005 Deposition of Monica S. Pippin ("Pippin Depo.") at 5-6)

60.   She also states that Mr. Shankman's conduct delayed the progress of her case. (Id. at 6)

---

[20]   Plaintiff's termination letter to Mr. Shankman does not state the reasons for his discharge but states that it was "for cause." (Plf. Ex. 34)   The court credits Plaintiff's testimony that she discharged Mr. Shankman for the reasons enumerated above. (See Dkt. 374)

[21]   According to the affidavit Mr. Tifford filed as an attachment to Plaintiff's supplemental brief (following the final evidentiary hearing in this case), he has incurred $26,893.08 in costs defending Mr. Shankman's charging lien. (Dkt. 429, Ex. A) However, the supplemental briefing was requested in lieu of closing argument at that hearing and was intended to function as such, not introduce new evidence or theories.

**F.   Plaintiff's Settlement with the Playboy Defendants and with all Counsel Except Mr. Shankman**

61.  On November 17, 2004, Mr. Tifford negotiated a settlement on Plaintiff's behalf with the Playboy Defendants. (See Dkt. 274, 283)

62.  The terms of the agreement, including the exact amount of the settlement, are confidential, but the court entered a protective order allowing Plaintiff's prior counsel who asserted timely charging liens access to the settlement's terms.[22] (Id.; Dkt. 276)  This court has also examined the amount of the settlement.

63.   On November 22, 2004, the district judge granted the Playboy Defendants' motion to dismiss Plaintiff's claims against them.[23] (Dkt. 276)

64.  On February 18, 2005, Plaintiff attended a court-ordered mediation with all of her former attorneys and successfully resolved the lien claims of Trenam Kemker, the Gary firm, Mr. Tancredo, the Restani firm, and Mr. O'Connor. (Dkt. 292)  Plaintiff did not resolve her fee dispute with Mr. Shankman during this initial mediation or during a second mediation held on March 2, 2005. (Dkt. 294)

---

[22] Further, this court also ordered Plaintiff and the Playboy Defendants to file a copy of the settlement agreement in camera for the court's review in deciding the issues relating to Mr. Shankman's fee. (Dkt. 388)

[23]  Plaintiff's claims against Anheuser-Busch Companies, Inc., Anheuser-Busch, Inc., Daytona Beverages, L.L.C., Daytona Beverages, Inc., and Deslin Hotels, Inc. remain pending.

65. Plaintiff's mediation agreement with the settling attorneys, attached to Plaintiff's Notice of Filing Stipulation of Settlement and Release of Certain Attorneys' Charging Liens (Dkt. 297), lists the percentage of Plaintiff's gross settlement that her prior counsel agreed to receive.  Under this agreement, Trenam Kemker and the Gary firm each received 10% of Plaintiff's gross recovery, Mr. Tancredo received 2.5%, and Restani and Mr. O'Connor received 1.5% each.  (Id. at Ex. A)  Mr. Tifford received the remaining 16%.[24] (Dkt. 350 at 5)

66. Plaintiff's contingency fee agreement with Tifford & Tifford, P.A. includes a 40% attorney's fees provision, and the Tifford firm has agreed to pay Plaintiff's previous attorneys, excluding Mr. Shankman, out of its portion of Plaintiff's recovery.[25] (See Plf. Ex. 35; Dkt. 350 at 5)

67. Based on the agreements reached with prior counsel, Plaintiff has paid 40% of her total recovery under the settlement

_____

[24] On March 30, 2005, the district court entered an endorsed order approving the Stipulation of Settlement between Plaintiff and the settling attorneys. (Dkt. 299)  The order directed the disbursement of a portion of the proceeds of Plaintiff's settlement to her prior counsel in accordance with the stipulation.  The order did not address the disbursement of funds to Plaintiff or the reservation of settlement funds pending resolution of Plaintiff's fee dispute with Mr. Shankman.

[25] This reduces Tifford & Tifford, P.A.'s recovery to 16% of Plaintiff's settlement. (Id.) Mr. Tifford also states that he is not charging Plaintiff attorney's fees for representing her in proceedings relating to Mr. Shankman's charging lien. (Dkt. 429 at 8-9)

agreement to attorneys.   All fees issues except for those of Mr. Shankman have been resolved.

> **G.   Summary of Mr. Shankman's Services**

68.   Mr. Shankman represented Plaintiff for a 25-month period between approximately July 16, 2002, until August 30, 2004.[26]

69.   He kept no detailed or contemporaneous records of the time spent on Plaintiff's case. (T2 183-84; Dkt. 430 at 15; Shankman Depo. II at 68-69)   Although Mr. Shankman testified that he devoted most of his time solely to Plaintiff's case, his conclusory assertion carries little weight in this quantum meruit determination.[27]   Allegedly, Ms. Kelly Yount ("Ms. Yount"), Mr. Shankman's legal assistant and fiancée, created a general time record for Mr. Shankman on a monthly basis but these records have not been produced.[28] (T2 183-84)

70.   However, the record does indicate that before Plaintiff filed her initial complaint, Mr. Shankman investigated her

---

[26]   As stated infra, Mr. Shankman's expert witness found that Mr. Shankman represented Plaintiff for 22 months; Mr. Shankman reaffirms this time period in his supplemental brief. (Dkt. 430 at 14) However, the record reflects that his representation actually spanned approximately 25 months.

[27]   In fact, the record reflects that at some point before July 20, 2003, Mr. Shankman was retained by four other plaintiffs in cases arising out of the same fact scenario involving the wet T-shirt contest. (See Plf. Ex. 13, 14)

[28]   These time records are not in evidence; it is undisputed that Mr. Shankman has no time records that the parties' experts and the court can look to in evaluating the quantum meruit value of his services to Plaintiff.

potential claims, located potential defendants and witnesses, and
attempted to ascertain the extent of the video's production,
distribution, and broadcast. (Shankman Depo. I at 38-40, 52;
Shankman Depo. III at 229-30)  He also attempted to discover how
often audiences viewed the videos by obtaining lists of purchasers
and broadcast schedules. (Shankman Depo. III at 206-08) He took
Plaintiff's statement and began researching federal and state law
for the purpose of developing Plaintiff's theories of recovery.
(Shankman Depo. I at 52-53)

71.   Mr. Shankman worked with Trenam Kemker to draft the
complaint by providing the factual background and offering his
research regarding theories of recovery and potential defendants.
(Id. at 58-59)  Mr. Shankman was the only attorney performing
factual investigative services for Plaintiff at the time.[29]  (Id.
at 227-230)  However, lawyers at Trenam Kemker were, at least to
some extent, duplicating Mr. Shankman's legal research efforts.
(Shankman Depo. III at 242)

72.   While associated with the Gary firm, Mr. Shankman
prepared for and attended depositions in the case as co-counsel and
questioned deponents on a few occasions. (See Dkt. 419)  However,
Mr. McManus of the Gary firm had primary responsibility for
conducting depositions.   Mr. Shankman participated in drafting

---

[29]  Mr. Shankman testified that while performing most of the
investigative work himself, he did have an investigator named Karen
Holton assist him. (Shankman Depo. I at 135)

affidavits in support of Plaintiff's summary judgment motion, contributed research to Plaintiff's summary judgment memorandum, drafted at least some of Plaintiff's summary judgment motion and memorandum, and to some extent participated in drafting Plaintiff's responses to defendants' summary judgment motions. (<u>Id.</u>; Shankman Depo. II at 78; Shankman Depo. III at 280)  He may have drafted a portion of a request for production, and he does not remember drafting any interrogatories. (Shankman Depo. I at 81-82)  He also assisted in drafting Plaintiff's amended complaint and did some legal research. (Shankman Depo. I at 180, 187-89)

73.   Additionally, he spent time researching whether the defendants had complied with their representations to Plaintiff that they had ceased to distribute the videos. (Shankman Depo. III at 244)

74.   Mr. Shankman also asserted that during his association with Mr. Tifford, he worked on a substantial number of court filings in the case, though upon review of the docket sheet he could not identify which ones. (Shankman Depo. II at 61-76)

75.   Further, Mr. Shankman was Plaintiff's primary contact. (Shankman Depo. III at 260) Indeed, he kept her away from the more experienced counsel he associated in the case and insisted that all communications occur through him.  Because Mr. Shankman "filtered everything" (McManus Depo at 43), Plaintiff frequently did not have an accurate picture of the progress of the litigation.

**H.   Mr. Shankman's Fee Dispute with Plaintiff**

76.   On June 8, 2005, Plaintiff filed an Amended Renewed and Supplemental Motion for Partial Disbursement of Settlement Proceeds.[30] (Dkt. 350)  Plaintiff's motion requests that the court order the disbursement of the remaining amount of the settlement to Plaintiff and address a "threshold determination" by "determining that Mr. Shankman is disentitled from any fees or, alternatively, must forfeit a determined amount of a fee award based upon <u>quantum meruit</u> as determined by Florida law . . ." (<u>Id.</u> at pp. 2,6).

77.   After briefings and oral argument from both sides, this court held in an order dated August 9, 2005, that Plaintiff discharged Mr. Shankman for cause and that a <u>quantum meruit</u> determination of the value of Mr. Shankman's services was appropriate.[31] (Dkt. 374)

II.   <u>Expert Testimony and Supplemental Briefings Regarding Quantum Meruit Value of Mr. Shankman's Services</u>

78.   Plaintiff and Mr. Shankman each have introduced expert testimony as to the value of Mr. Shankman's legal services to

---

[30] On February 4, 2005, and March 31, 2005, Plaintiff filed a Motion for Disbursement of Funds (Dkt. 283) and Renewed Supplemental Motion for Partial Disbursement of Settlement Proceeds (Dkt. 300), respectively.  The district judge denied both of these motions without prejudice pending resolution of the dispute over Mr. Shankman's attorney's fees. (Dkts. 287, 304)

[31] The findings and conclusions in this court's August 9, 2005 order are incorporated as if fully set forth herein.  However, some of them are summarized <u>infra</u> for ease of reference.

25

Plaintiff pursuant to this court's order indicating that only expert testimony would be taken at the <u>quantum</u> <u>meruit</u> hearing. (Dkt. 371)

79.   The testimony of the expert witnesses, both of whom the court recognizes as well-respected, experienced federal litigators, differs considerably; one submits that Mr. Shankman is entitled to no less than $350,000 in fees; the other expert witness states that Mr. Shankman is entitled to no fees at all.

80.   In lieu of closing arguments, the parties also filed supplemental briefings after the hearing. (<u>See</u> Dkts. 429, 430)

### A.   Plaintiff's Expert Witness

81.   Plaintiff's expert witness, Robert V. Williams, Esq. ("Mr. Williams")[32], has opined that the damages Plaintiff incurred as a result of Mr. Shankman's misconduct exceed the value of Mr. Shankman's services to her and that the court, therefore, should not award Mr. Shankman any attorney's fees.[33]

82.   In arriving at this opinion, Mr. Williams first multiplied his estimate of the total number of hours Mr. Shankman spent investigating Plaintiff's case and attending depositions

---

[32]   Mr. Williams is a practicing attorney who this court determines is well-qualified to serve as an expert witness in this proceeding, as is Mr. Addison, the expert witness for Mr. Shankman. Neither side challenged the qualifications of the experts.

[33]   Mr. Williams based his opinion on his review of the pleadings, deposition transcripts, exhibits, e-mails, correspondence, and on telephone interviews with Plaintiff's prior counsel. (T4 19-20)

(approximately 100 hours), by the average hourly rate of a Plant City attorney ($150.00), and concluded that Mr. Shankman contributed $15,000.00 of value to Plaintiff's case. (T4 25-26) Mr. Williams then evaluated the detriment Mr. Shankman caused Plaintiff as exceeding this figure.[34] (T4 42-43)

**B.   Mr. Shankman's Expert Witness**

83.   Michael Addison, Esq. ("Mr. Addison") testified that the <u>quantum</u> <u>meruit</u> value of Mr. Shankman's services to Plaintiff is at least $350,000.00.[35] (T4 101)  Mr. Addison estimated that Shankman devoted 100 hours per month to Plaintiff's case for 22 months at a

---

[34]  Mr. Williams stated that the frequency with which Mr. Shankman associated and reassociated with co-counsel detrimentally impacted the momentum of the litigation and Plaintiff's bargaining position with the defendants.  (T4 38-40)  Also, the contingency fee that Plaintiff initially agreed to had increased from 40% to 45% by the time Plaintiff terminated Mr. Shankman.  (T4 40) Further, he noted that all fee agreements after the Gary Agreement were structured such that any amount awarded to prior counsel would be subtracted from Plaintiff's recovery, not from her counsel's; as a result Plaintiff's recovery is reduced.  (T4 42)  Mr. Williams also emphasized that Mr. Shankman was not the attorney who secured the settlement agreement with the Playboy Defendants, Mr. Tifford was. (T4 44) Notably, Mr. Williams did not consider Mr. Shankman's identification of additional defendants, plaintiffs, and witnesses in reaching his conclusion; however, he did opine that much of this information would have been obtained through the discovery process if Mr. Shankman's investigation had not revealed it first. (T4 58-61, 64) He also stated that Mr. Shankman's investigative work could have been done by a non-lawyer and that the legal input he provided his co-counsel was not requested and was not necessary. (T4 31-32, 45)

[35]  Mr. Addison based his opinion on his interviews of Mr. Shankman and Mr. Silver and on his review of the pleadings and depositions in the case. (T4 91-92)

rate of $150.00 per hour, which yields the figure of $350,000.00. (Id.) Mr. Addison pointed out that Trenam Kemker and the Gary firm each received 10% of Plaintiff's recovery. (T4 104) Mr. Shankman represented Plaintiff longer than both firms combined and should receive at least 20%, according to Mr. Addison. (Id.)

84. Because Plaintiff informed Mr. Shankman early in her case that her goal was to stop the distribution of the videotapes, Mr. Addison reasoned that Mr. Shankman's repeated hiring and firing of co-counsel with this in mind did not detract from his representation of Plaintiff; he was, in fact, doing what he believed he was ethically bound to do as her counsel. (T4 106-07)

III. Conclusions of Law

   A.   Whether Mr. Shankman Earned Attorney's Fees Pursuant to a Valid Fee Agreement

Plaintiff's first argument is that Mr. Shankman completely forfeited his fees because he fraudulently induced Plaintiff into agreeing to the fee increase from 40% under the Trenam Agreement to 45% under the Gary Agreement. Under Florida law, however, without first determining the quantum meruit value of the attorney's services, a court may hold that an attorney completely forfeits his fees only if no valid fee agreement ever existed.[36] See Searcy, Denney, Scarola, Banhart & Shipley, P.A. v. Scheller, 629 So.2d

---

[36] The parties agree that Florida law applies in this fee dispute. (Dkt. 339 at 18)

28

947, 955 (Fla. 4th Dist. Ct. App. 1993).[37]   Though Mr. Shankman's conduct in this case was unprofessional, bumbling, and outrageous at times, it does not warrant a complete forfeiture of his attorney's fees based on the parameters established by the Florida caselaw which this court must follow.

Complete fee forfeiture, while not always inappropriate, is a drastic remedy:

> [F]ee forfeiture is not an automatic remedy, even for serious transgressions. Forfeiture of all fees is the final remedy, one to be hesitatingly applied only when no other remedy will fairly vindicate the unique standards of conduct to which lawyers have sworn fealty. While a court should not shrink in a proper case from denying all compensation to an offending lawyer, it should do so only after exhausting the aptness of all other remedies to cure the specific act of misconduct in issue.[38]

---

[37] "In matters of state law, federal courts are bound by the rulings of the state's highest court.  If the state's highest court has not ruled on the issue, a federal court must look to the intermediate state appellate courts."  Coral Springs St. Sys. v. City of Sunrise, 371 F.3d 1320, 1333-34 (11th Cir. 2004)(quoting Veale v. Citibank,F.S.B., 85 F.3d 577, 580 (11th Cir. 1996).

[38] In Searcy, after achieving a favorable verdict and during post-appeal settlement negotiations, the attorney attempted to convince his client to sign a new contingency fee agreement.  629 So.2d at 948.  In fact, the attorney's attention was so focused on this task that the parties did not settle at that time.  Id.  The client refused to sign the new agreement, discharged the attorney, and reached a much lower settlement figure with the help of his new counsel.  Id.  In resolving the first attorney's charging lien, the trial court held that the attorney was not entitled to a fee because his conduct was a material breach of the fee agreement. Id. at 949.  The appeals court accepted the lower court's finding that the attorney's conduct was, among other things, "an attempt to pressure his client, at a time of great disadvantage for the client, into signing a new fee agreement with more favorable terms

29

Id.  The Searcy decision distinguishes between cases in which no valid fee agreement ever existed and cases in which the attorney's misconduct after the procurement of a valid fee agreement leads to the attorney's termination and subsequent fee reduction.  Id. at 950, citing Jackson v. Griffith, 421 So.2d 677, 678 (Fla. 4th Dist. Ct. App. 1982), (holding that an attorney is not entitled to a fee under quantum meruit and will completely forfeit any fee where the fee agreement was procured by coercion, duress and threats); Spence, Payne, Masington & Grossman, P.A. v. Gerson, P.A., 483 So.2d 775, 776 (Fla. 3rd Dist. Ct. App. 1986) (holding that an attorney who procured his employment contract in violation of an antisolicitation statute could not recover under quantum meruit); see also Lance Holding Co. v. Ashe, 533 So.2d 929, 930 (Fla. 5th Dist. Ct. App. 1988) (reversing an award of attorney's fees where the attorney did not note on his resume that he had been suspended from the Florida bar for a federal felony conviction; the court found that the attorney's material misrepresentation of his qualifications precluded a quantum meruit recovery); Thomas v. Ratiner, 462 So.2d 1157, 1159 (Fla. 3rd Dist. Ct. App. 1985) (stating, with no mention of quantum meruit, that a doctor/attorney who coerced his patient into signing an employment agreement with

―――――――――――――――

to the lawyer". Id. at 949. However, the court held that a quantum meruit determination was required to determine the actual value of the attorney's services.

30

him while still in the doctor/patient relationship was prohibited from recovering under the contract).

Plaintiff does not argue that Mr. Shankman misrepresented his experience or qualifications to her before she retained him, nor does she contend that Mr. Shankman coerced her into signing the Trenam Agreement, their initial contingency fee contract.[39]  Instead Plaintiff asserts that Mr. Shankman induced her to agree to the 5% increase in the rate for attorney's fees by falsely representing to her and her parents that the 45% fee included in the Gary Agreement was the same fee they agreed to in the Trenam Agreement.

The evidence is insufficient to support a finding that Mr. Shankman fraudulently induced Plaintiff to sign the Gary Agreement.[40]  Plaintiff testified that she willingly signed the Gary Agreement despite the dispute over whether it increased the contingency fee.  Further, in negotiating the subsequent fee agreements after discharging the Gary firm, Plaintiff could have insisted on a return to the 40% contingency fee included in the

---

[39] There is no evidence that Mr. Shankman was dishonest in stating his qualifications and experience level to Plaintiff.  In fact, Mr. Shankman testified that he decided to associate with co-counsel partially due to his lack of federal court experience.

[40] The elements of fraudulent inducement under Florida law are: (1) a party's misrepresentation of a material fact; (2) that the party knew or should have known was false; (3) that the party intended for the misrepresentation to induce another party into an agreement; and (4) that the induced party is injured by acting in justifiable reliance on the misrepresentation.  See Jankovich v. Bowen, 844 F.Supp. 743, 747 (S.D. Fla. 1994).

31

Trenam Agreement; instead, she signed the Litigation Concepts Agreement, which provided for a 45% contingency fee, with knowledge of the 5% fee increase from the Trenam Agreement to the Gary Agreement.  <u>See</u> <u>Searcy</u>, 629 So.2d 949 (holding that the attorney did not forfeit his entire fee even though he attempted to pressure the client into signing a new fee agreement, more advantageous to the lawyer, at a vulnerable time in the litigation).

Because a valid fee agreement existed between Plaintiff and Mr. Shankman, sufficient grounds for complete forfeiture of Mr. Shankman's legal fees prior to a <u>quantum</u> <u>meruit</u> determination as to the value of his legal services do not exist.[41]

**B.   <u>Quantum</u> <u>Meruit</u> Determination**

The fee determination from this point is a three-step process under Florida law:  First, the court is required to determine the amount of Mr. Shankman's attorney's fees in <u>quantum</u> <u>meruit</u>.  <u>See</u> <u>Kushner v. Engelberg, Cantor & Leone, P.A.</u>, 699 So.2d 850, 851 (Fla. 4th Dist. Ct. App. 1997); <u>Searcy</u>, 629 So.2d at 955.  The next step is for the court to reduce Mr. Shankman's <u>quantum</u> <u>meruit</u> award by the amount of damages, if any, Plaintiff incurred due to Mr. Shankman's representation.  <u>Id.</u>  If the client's damages do not exceed the <u>quantum</u> <u>meruit</u> fee, the final step is for the court to determine whether forfeiture of some or all of the <u>quantum</u> <u>meruit</u>

---

[41]  The question of which fee agreement controls is discussed <u>infra</u>.

fee as already reduced by the client's damages is appropriate. <u>Searcy</u>, 629 So. 2d at 955.  In making its determination, a court must consider the "totality of the circumstances" surrounding the professional relationship between the attorney and the client.  <u>See Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Poletz</u>, 652 So.2d 366, 369 (Fla. 1995) (<u>Poletz</u>) (rejecting the lodestar approach to assessing a <u>quantum</u> <u>meruit</u> fee because it does not allow for consideration of the "totality of the circumstances . . . [u]nlike an award of attorneys' fees to a prevailing party, a <u>quantum</u> <u>meruit</u> award must take into account the actual value of the services to the client"); <u>Rosenberg v. Levin</u>, 409 So.2d 1016, 1022 (Fla. 1982); Rules Regulating Fl. Bar, R. 4-1.5(b).

Relevant considerations to a <u>quantum</u> <u>meruit</u> determination include those set forth in Rule 4-1.5(b) of the Rules Regulating the Florida Bar, including time, the recovery sought, the skill demanded, the results obtained, and the attorney-client contract itself.[42]  <u>See</u> <u>Poletz</u>, 652 So.2d at 369; Rules Regulating Fl. Bar, R. 4-1.5(b).

Further, an attorney discharged for cause is entitled to the <u>quantum</u> <u>meruit</u> value of his services less any damages the client

---

[42]  Application of these factors is a starting point for courts.  Because the factors relevant to the determination of the reasonable value of the services rendered will vary from case to case, the court is not limited to this list.  <u>Searcy</u>, 652 So.2d at 369.  "The court must consider any other factors surrounding the professional relationship that would assist the court in fashioning an award that is fair to both the attorney and the client." <u>Id.</u>

incurred due to attorney misconduct.  <u>Cooper v. Ford & Sinclair, P.A.</u>, 888 So.2d 683, 690 (Fla. 4th Dist. Ct. Ap. 2004); <u>Searcy</u>, 629 So.2d at 954.  As stated in this court's August 9, 2005 order, Plaintiff has articulated good faith reasons for discharging Mr. Shankman for cause.[43]

The court has undertaken an analysis of the relevant factors in making its <u>quantum meruit</u> determination:

      1.   <u>Contingency fee contract between Mr. Shankman and Plaintiff</u>

Mr. Shankman's recovery is capped by the maximum amount he would have obtained under his contingency fee contract with Plaintiff.  <u>Rosenberg</u>, 409 So.2d at 1021.  However, there is significant controversy over what is the controlling fee agreement.

---

[43]  A client has great latitude in discharging his or her attorney, and an attorney's authority to act for a client is freely revocable by the client.  <u>See</u> comment to Rule 4-1.16, Rules Regulating the Florida Bar.  Almost any good faith reason asserted by the client may constitute cause to discharge an attorney, from conduct which causes a client to lose faith in the attorney to an attorney's attempts to extort a new fee agreement during intense, high-stakes settlement negotiations.  <u>See</u> <u>Searcy</u>, 629 So.2d at 949-50; <u>Tobias v. King</u>, 406 N.E.2d 101, 104 (Ill. App. Ct. 1980) (noting that attorney was discharged for cause where client was dissatisfied with attorney's handling of the case that had made little progress in three and one-half years); <u>Fracasse v. Brent</u>, 494 P.2d 9, 13 (Cal. 1972) (noting that "[i]t should be sufficient that the client has, for whatever reason, lost faith in the attorney, to establish 'cause' for discharging him").  Courts have held that because the power of the client to discharge his or her attorney is an implied term of the retainer contract, "the client does not breach the contract when he or she terminates the attorney-client relationship based on a reasonable subjective dissatisfaction with the attorney's services, even if the client does not have 'good cause.'" <u>Somuah v. Flachs</u>, 352 Md. 241, 251 (Md. Ct. App. 1998).

Mr. Shankman's Notice of Charging Lien references a May 24, 2004 "Contingency Fee Representation Agreement in which Ms. Pippin agreed to pay the attorney's fees of Richard S. Shankman, Esq. and Litigation Concepts, L.C. as stated therein and to reimburse them for all costs incurred or paid for the firm or on their behalf." (Dkt. 258 at 2)  The only document the parties have produced that is dated May 24, 2004, however, is the May 24 Addendum (fully titled the "Addendum to Co-Counsel Contingency Fee Representation Agreement"), in which Plaintiff authorizes Mr. Shankman to associate with Mr. Cassetty and Mr. O'Connor, authorizes a 50/50 fee split between Litigation Concepts and the other firms, and includes Mr. Shankman's obligation to pay Mr. Tancredo 25% of his recovery.

Despite his vague testimony to the contrary, in his supplemental brief Mr. Shankman states that the May 24, 2004 contingency fee agreement referenced in his charging lien is actually the May 24 Addendum, which he asserts was affixed to the Litigation Concepts Agreement when he presented it to Plaintiff for her signature. (*Id.* at 17-18) The Litigation Concepts Agreement included a 45% contingency fee clause, and based on this Mr. Shankman asserts that he is entitled to a recovery not to exceed 45% of Plaintiff's gross settlement.[44] (Dkt. 430 at 4)

---

[44] Mr. Shankman points out that under Florida law his lack of time records is not fatal to his request for attorney's fees. (*Id.* at 16) Mr. Shankman also posits that his conduct has not

On the other hand, Plaintiff argues that any fee awarded to Mr. Shankman (which Plaintiff contends should be zero) in any event should be capped by the contingency fee he agreed to in the Trenam Agreement (12.8%).[45]  Additionally, in her supplemental brief filed after the final <u>quantum</u> <u>meruit</u> hearing, Plaintiff argues that any fee the court awards Mr. Shankman should be reduced by the value of 24% of the amount of the settlement paid to Plaintiff's prior attorneys (in total) as a result of the mediation. (Dkt. 429 at 18-19)  In support, Plaintiff contends that Mr. Shankman's oral promise to pay the discharged attorneys' fees out of his pocket is enforceable, despite his refusal in open court to honor this promise. (<u>Id.</u>)

That Mr. Shankman's charging lien does not properly refer to the contingency fee agreement that he now argues is the controlling agreement is yet another example of his ineptitude as an attorney.  However, there is sufficient basis to conclude that the agreement referenced in his charging lien is the Litigation Concepts Agreement as modified by the May 24 Addendum.  In its title, the

---

detrimentally affected Plaintiff because Mr. Tifford paid the liens of her prior counsel out of his portion of the recovery. (<u>Id.</u> at 18)  This argument is disingenuous.  Mr. Tifford states that he has agreed to pay Plaintiff's prior counsel out of his attorney's fees share.

[45]  In her supplemental brief Plaintiff also argues for the first time that Mr. Shankman's Notice of Charging Lien is an attempt to perpetrate a fraud on the court because it refers to a contract that she contends does not exist. (Dkt. 429 at 2-9)

May 24 Addendum references a "Co-Counsel Contingency Fee Representation Agreement"; and the Litigation Concepts Agreement, dated August 6, 2003, is titled the "Co-Counsel Contingency Fee Representation Agreement."

Further, even if Mr. Shankman's reference to a May 24, 2004 contingency fee agreement in his charging lien is insufficient to show an express contract, it is undisputed there was at least an implied contract between Plaintiff to retain Mr. Shankman as her attorney and an implied understanding for the payment of fees out of the recovery. Therefore, Mr. Shankman meets the requirements of a valid charging lien under Florida law. See Flynn v. Sarasota County Pub. Hosp. Bd., 169 F. Supp.2d 1363, 1368 (M.D. Fla. 2001).

However, assuming that the Litigation Concepts Agreement as modified by the May 24 Addendum was the controlling fee agreement when Plaintiff terminated Mr. Shankman, this does not explain how Mr. Shankman can contend that he is entitled to 45% of Plaintiff's gross settlement proceeds; under the May 24 Addendum, Mr. Shankman agrees to accept only half of 45%, and 25% of that is promised to Mr. Tancredo. In the best of circumstances (not present here), Mr. Shankman's recovery would be capped at 16.9 percent of Plaintiff's recovery.[46]

---

[46] Mr. Shankman's insistence that he is entitled to 45% of Plaintiff's gross settlement is, to put it mildly, incredible given that Plaintiff already has paid out 40% of her recovery to attorneys. As Plaintiff points out, this would leave her with a 15% recovery.

In any event, the court does not need to resolve the disagreement over which fee agreement governs the maximum amount of Mr. Shankman's recovery because it is enough that a fee agreement between Plaintiff and Mr. Shankman did exist, and that the <u>quantum</u> <u>meruit</u> value of Mr. Shankman's services, as discussed hereafter, is far less than either of the amounts under either Plaintiff's or Mr. Shankman's interpretation.

2.   <u>Time   Mr.   Shankman   Expended   on   Plaintiff's</u>
     <u>Litigation</u>

This court has only Mr. Shankman's unsupported assertion that he devoted most of his time to Plaintiff's case during the months that he represented her.  As stated, there are no time records to back this up, and Mr. Shankman's own expert estimated no more than 100 hours per month over 22 months.[47]

Mr. Shankman's failure to maintain detailed time records is not fatal to his fee application because the court's <u>quantum</u> <u>meruit</u> determination is not based on actual time expended but on the actual value of Mr. Shankman's services.[48]  The court is compelled, however, to evaluate the appropriateness of the approximate number

---

[47]  Based on the pleadings and other written submissions Plaintiff filed and the discovery she engaged in, the parties experts could only estimate the amount of time Mr. Shankman expended representing her once the lawsuit was initiated.  The experts also were left to estimate the time Mr. Shankman spent investigating Plaintiff's potential claims and potential defendants and witnesses before the case was filed.

[48]  Plaintiff's expert, Mr. Williams, conceded this point. (T4 52)

of hours expended and the necessity of their performance.  See
Mercy Hosp., Inc. v. Johnson, 431 So.2d 687, 688 (Fla. 3rd Dist.
Ct. App. 1983).

If Mr. Shankman spent 40 hours per week for 22 months working
on Plaintiff's case, as he contends, he would have invested over
3500 hours in the case.  Even Mr. Shankman's expert witness agrees
that this number must be reduced; he estimated that Mr. Shankman
worked 100 hours per month for 22 months, or approximately 2200
hours, on Plaintiff's case.  Although the court has no doubt that
Mr. Shankman invested significant time in Plaintiff's case, the
preponderance of credible evidence indicates that he spent a good
bit of that time either unnecessarily duplicating the efforts of
his lead counsel or observing them at depositions.  Also, Mr.
Shankman invested much time in his quest to locate additional
videos rather than utilizing a more cost-effective means of
investigation such as having an investigator do this work at the
particular locations he visited.

Nonetheless, prior to and during the association with Trenam
Kemker (before Mr. Shankman had settled into the pattern of hiring
and firing co-counsel) his contributions were generally helpful in
determining the extent of the video's distribution and the parties
involved, including potential witnesses.  His initial investigation
into the factual and legal background of Plaintiff's case before
the complaint was filed was valuable work that allowed his co-

counsel to familiarize themselves with the issues relatively quickly.

Although the bulk of his early contributions were fact discovery, it did include some legal research apparently into the applicable federal and state statutes and case law. Mr. Shankman, however, kept no records of either activity.

Therefore, the court considers the time Mr. Shankman invested from July 16, 2002, until January 23, 2003, the date of the Gary Agreement, to be Mr. Shankman's's most valuable contribution to Plaintiff's case. For this six-month period, the court credits Mr. Shankman's efforts as worth 20 hours per week for a total of 480 hours; this is a reasonable reflection of the amount of time Mr. Shankman should have expended on Plaintiff's case. This time is further allocated as follows:  240 hours performing detailed factual investigation (a service an investigator could have performed at a lower rate than that charged by counsel)  and 240 hours researching applicable law and acting as Plaintiff's counsel.

After Plaintiff discharged Trenam Kemker and retained the Gary firm, the evidence suggests that the value of Mr. Shankman's services sharply declined. As the facts of the case came into focus, Mr. Shankman devoted more of his time to scrutinizing and criticizing his co-counsels' decisions than zealously representing Plaintiff's best interests. Indeed, he must have expended a large amount of time during this period locating and retaining new

40

counsel, negotiating fee agreements, and updating his co-counsel of the moment on the status of the case.   Further, from at least July 20, 2003, he split his time between Plaintiff's case and representing four other plaintiffs in similar causes of action. Therefore, the number of hours Mr. Shankman reasonably spent representing Plaintiff from January 23, 2003, until August 30, 2004 (the date Plaintiff discharged him - a period of approximately 19 months) should be estimated at no more than 380, or 20 hours per month.[49]   During this time period, Mr. Shankman should be compensated for providing legal services.

    In conclusion, 860 hours is a reasonable total number of hours Mr. Shankman spent representing Plaintiff.   Of these 860 hours, 240 were spent investigating the facts of the case, and 620 hours were spent providing services that lawyers typically provide.

### 3.   Recovery Sought by Plaintiff

    Plaintiff sought to halt the sale and distribution of the videotapes and to obtain monetary compensation as a means of punishing the defendants for their actions.   Plaintiff eventually reached a settlement but not when she was represented by Mr. Shankman.

    Although there were disagreements over the wisdom of seeking

---

[49]   Mr. Shankman's expert bases his calculation of Mr. Shankman's fees on 22 months of representation.   However, the record reflects that Mr. Shankman actually represented Plaintiff for approximately 25 months, from around July 16, 2002 until August 30, 2004.

preliminary injunctive relief (among Mr. Shankman and his more experienced co-counsel) there is little doubt that Plaintiff's lawyer-shuffling, done at Mr. Shankman's insistence, no doubt contributed to the lack of momentum in the case and hindered the maintenance of a strong litigation posture.  Further, a settlement conference which the Gary firm had scheduled with the Playboy Defendants for Labor Day 2003 never transpired because Mr. Shankman's persuaded Plaintiff to fire the firm.  It took more than another year before the case was finally settled.

　　　　4.　Skill Demanded in Prosecuting the Case

　　The legal and factual issues in this case were relatively novel; Mr. Shankman recognized that he did not have the skill or experience to handle Plaintiff's case without associating with experienced trial counsel.  Accordingly, it is reasonable that he should not insist on a lion's share of any recovery.

　　Mr. Shankman's investigative work no doubt benefitted his co-counsel.  However, this type of investigative work does not require the skills of an attorney, even one who has been practicing for only three years.  Mr. Shankman was not the primary drafter of either the complaint, the amended complaint, Plaintiff's motion for summary judgment, or the motion for preliminary injunction.  Mr. Shankman's co-counsel needed little of his input on framing the legal issues.

5.   <u>Results Obtained in Plaintiff's Case</u>

It was Mr. Tifford, not Mr. Shankman, who obtained settlements with the Playboy Defendants and all of Plaintiff's former attorneys except for Mr. Shankman.

Although Mr. Shankman was responsible for associating with Mr. Tifford, he was out of case two and one half months before the parties signed the settlement agreement and before any bona fide settlement discussions took place.  Mr. Shankman cannot take credit for obtaining Plaintiff's settlement.

6.   <u>Mr. Shankman's Reasonable Hourly Rate</u>

Plaintiff's expert witness testified that $150.00 is a reasonable hourly rate for an experienced attorney in Plant City. Given Mr. Shankman's lack of litigation experience, however, $110.00 is a more appropriate hourly fee for the amount of time Mr. Shankman expended on providing Plaintiff legal – and not investigative – services (620 hours).  Mr. Shankman's investigative efforts (240 hours) should be compensated at the rate of $60.00 per hour; in the court's experience this is a reasonable fee for a non-attorney investigator for work of the type conducted by Mr. Shankman.

7.   <u>Reasons for Mr. Shankman's Discharge</u>

The reasons for Mr. Shankman's for cause termination are stated above and in this court's August 9, 2005 order and will not be restated here.   In sum, Plaintiff was fully justified in

discharging Mr. Shankman.

        8.   Other Factors

    The court has reviewed Plaintiff's settlement agreement with the Playboy Defendants, which the parties filed in camera pursuant to court order.[50] (Dkt. 388) Submissions filed in the public record indicate that to date, Plaintiff has paid 40% of her total recovery under the agreement to attorneys other than Mr. Shankman.

    As stated, the number of hours for non-legal (investigative) services performed by Mr. Shankman is a total of 240 hours at $60 ($14,400).  The number of hours for legal work (620 hours) at $110 equals $68,200 resulting in a total fee of $82,600.

    The next issue is whether other factors should affect the fee in a negative or positive way.  The court finds no reasons to adjust this figure upwards, but there is ample justification for a substantial reduction in the fee due to Mr. Shankman's conduct in repeatedly hiring and firing co-counsel in this case, thereby disrupting the pace of the litigation and increasing the legal expenses.  In addition, his total failure to document the hours spent on the case, while not justifying a zero award of attorney's fees, certainly justifies a substantial discount of the quantum meruit amount.

_____

    [50] Mr. Shankman's counsel in these proceedings is not privy to the amount of the settlement. (See Dkt. 388)  Mr. Shankman, however, is aware of this amount as he participated in the mediations to resolve Plaintiff's prior counsels' charging liens. (T3 95)

Mr. Williams, Plaintiff's expert witness, observed that Mr. Shankman's conduct in hiring and firing attorneys slowed the pace of the litigation and gave the defendants a strategic advantage. There is no way to be absolutely sure, of course, that Plaintiff could have obtained a more favorable settlement and one sooner than she did absent Mr. Shankman's conduct, but it cannot be denied that the effect was disruptive.

Plaintiff's legal strategy was disjointed and was interrupted regularly by new counsel who had to familiarize themselves with the legal and factual issues. Plaintiff understood that, ultimately, she was the one making the hiring and firing decisions. However, Plaintiff was looking to her attorney to guide her in making appropriate decisions, and she was especially vulnerable given the delicate subject matter of the case, the fact that she was a minor for a period of time after retaining counsel, and the fact that she was suing huge corporate defendants.

As stated previously, Mr. Shankman kept no records and made no effort to reconstruct his work activity to assist the court in determining an appropriate fee. Simply calling an expert witness does not discharge his obligation to attempt to reconstruct his time during the twenty-five months he represented Plaintiff in this case.

Based on these considerations, a reduction in the quantum meruit value of Mr. Shankman's services by 40%, from $82,600 to

$49,560 is appropriate.   The court selects this percentage to emphasize the significant effect of Mr. Shankman's conduct both in terms of "churning" the case by repeatedly hiring and firing new counsel and in light of his total failure to keep records.

Accordingly, $49,950 is the <u>quantum</u> <u>meruit</u> value of Mr. Shankman's services to Plaintiff, unreduced for Plaintiff's damages or any other factors discussed hereafter.

### C.   Plaintiff's Damages

Plaintiff bears the burden of establishing the damages that flowed from Mr. Shankman's termination for cause which happened on August 30, 2004, over two years after first approaching his firm to serve as her counsel.

At deposition Plaintiff testified that her damages include the costs and expenses she agreed at mediation to pay her prior attorneys, the costs and expenses associated with these proceedings, and the loss of use of her settlement proceeds due to the delay in disbursement.   She also testified to being distressed due to Mr. Shankman's constant interruption of the proceedings through hiring and firing attorneys.   However,  she could not quantify the amount of her damages.[51]

---

[51] As stated previously, in her supplemental brief filed after the hearings, for the first time Plaintiff submits that Mr. Tifford has expended $26,893.08 in costs defending Mr. Shankman's charging lien.   Mr. Shankman has not had the opportunity to refute this assertion, and the court will not subtract this amount from its fees determination.

46

In fact, Mr. Shankman did eventually introduce her to Mr. Tifford, her current counsel and the attorney who negotiated the settlement with the Playboy Defendants.  Mr. Shankman admitted that he was unskilled in federal practice, and had enough sense to associate with very experienced co-counsel throughout the case. The evidence does not show that Plaintiff entered into the various contingency agreements blindly.  She was aware that she was the person with the power to hire and fire attorneys.

Plaintiff's expert witness was also unable to assign a specific amount in damages, while estimating that Plaintiff's damages were at least $15,000.  This showing is also insufficient, and the court is unable to conclude that a further reduction due to damages has been established as appropriate in this case.

### D.   Forfeiture of Some or all of Mr. Shankman's <u>Quantum Meruit</u> Fee as Reduced by Plaintiff's Damages

The final step for the court is to determine whether further reduction of Mr. Shankman's fee is appropriate.  The answer to this question is in the affirmative.[52]

Mr. Shankman's misconduct was pervasive, and it was difficult for Plaintiff and co-counsel to detect at first.  For example, a significant issue at the hearings and during depositions was what Mr. Shankman told Plaintiff and her parents regarding Plaintiff's

---

[52] Although this would appear to be unnecessary, having begun the legal analysis with the forfeiture issue, the relevant case law cited previously requires us to return to this issue after conducting the <u>quantum</u> <u>meruit</u> analysis.

47

potential liability for the fees of the discharged attorneys.
Plaintiff testified that Mr. Shankman told her repeatedly that she
would not have to pay her prior attorneys anything because they
were discharged for cause.  This is a clear misstatement of the
law.

Plaintiff's stepfather's testimony generally supports
Plaintiff's recollection of conversations with Mr. Shankman
regarding discharged attorneys; however, Mr. Keely also states that
Mr. Shankman told them that the court could hold a <u>quantum meruit</u>
hearing at the end of the case to determine the amount of fees
Plaintiff owed her prior counsel. (T2 34) Because Plaintiff
admitted to being confused at times about legal terminology and
testified that she deferred to her stepfather's decisions sometimes
due to this confusion, the court credits Mr. Keely's testimony on
this topic.[53]  Further, as a non-lawyer, Mr. Keely would have no
reason to be familiar with the term "<u>quantum meruit</u>" at that point
unless Mr. Shankman had mentioned the possibility of obtaining a
<u>quantum meruit</u> award to him.

However, as the most egregious example of how Mr. Shankman's
ineptitude evolved into greed, Mr. Shankman failed to structure the

---

[53] Mr. Keely violated this court's sequestration order and his
testimony was restricted to matters not involving Plaintiff's
association with Trenam Kemker. (T2 21) However, on the issue of
what Mr. Shankman told Plaintiff and her parents regarding
discharged attorneys, the court credits Mr. Keely's testimony for
the reasons stated above.

fee agreements after the Gary Agreement such that the fees of prior attorneys would be paid out of the attorney's portion of recovery rather than the client's, even though he went so far as to repeatedly promise Plaintiff that he would pay any fees of prior attorneys out of his portion of the recovery.

Certain other isolated instances of Mr. Shankman's misconduct may not appear so damaging by themselves but cumulatively present a compelling case for a partial forfeiture of the fee. At the time Plaintiff did not have enough information or perspective to understand the impact her decision to trust Mr. Shankman would have on her case. As a whole, Mr. Shankman's conduct fell substantially below the standards expected of an attorney and officer of the court.

Due to Mr. Shankman's emphatic and misleading assurances that Plaintiff would not be in the situation in which she finds herself today, it is wholly appropriate to find that of the <u>quantum</u> <u>meruit</u> fee due Mr. Shankman of $49,560, an additional $20,000 of this be forfeited due to his misconduct, as set forth above. The court selects the amount of $20,000 to emphasize the seriousness of his conduct and with the expectation (hopefully not misplaced) that this will deter Mr. Shankman from taking advantage of any other clients he may represent.

Even in the absence of Mr. Shankman's misconduct, an additional forfeiture of fees in this case in the amount of $20,000

49

would be justified on the grounds of cost and delay.  Although the costs in representing Plaintiff in this protracted fee dispute have not been assessed as damages for the reasons previously stated, the court has no doubt that her costs have been substantial.  Also, the resolution of this fee dispute delayed Plaintiff's access to the settlement funds, or at least a portion of them.

For these reasons, $20,000 of Mr. Shankman's fee of $49,560 should be forfeited.  He should receive a fee of $29,560 for his work in this case representing Plaintiff.

Accordingly and upon consideration, the undersigned **RECOMMENDS** that:

(1)  Mr. Shankman be awarded attorney's fees of $29,560 from Plaintiff's settlement proceeds held in escrow and that the balance be disbursed to Plaintiff and any charging lien for Mr. Shankman be dismissed; and

(2)  any pending motions related to this issue be denied.

Dated: January 27th, 2006

ELIZABETH A JENKINS
United States Magistrate Judge

50

NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal.   <u>See</u> 28 U.S.C. § 636(b)(1).